[No. B180282. Second Dist., Div. Seven. June 14, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
QUENTIN MAYO, Defendant and Appellant.

**Counsel**

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kyle S. Brodie and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**PERLUSS, P. J.**—The jury in this first degree murder case was instructed the People have the burden to prove beyond a reasonable doubt each of the elements of murder; defendant Quentin Mayo must be found not guilty of murder in the first degree unless the jury concludes beyond a reasonable doubt the murder was deliberate and premeditated; and resolution of Mayo's guilt must be based on the evidence presented and not on facts outside the evidence or inferences derived from the fact of Mayo's arrest or resulting trial. Apparently through an oversight, however, the trial court failed to instruct the jury with CALJIC No. 2.90,[1] defining reasonable doubt as the

---

[1] CALJIC No. 2.90 provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is

absence of "an abiding conviction of the truth of the charge" and admonishing the jury defendant is presumed innocent until the contrary is proved. Was that omission federal constitutional error requiring reversal?

The United States Supreme Court has held unequivocally the federal Constitution does not require the trial court to define reasonable doubt or to instruct specifically on the presumption of innocence, provided the jury is adequately informed of the reasonable doubt standard and the corollary due process requirement that guilt be determined only from the evidence presented at trial. Consistent with that authority, we hold the instructions given adequately apprised the jury of both the reasonable doubt standard and the due process requirement that guilt be adjudged solely on the evidence presented. Thus, the omission of CALJIC No. 2.90 in this case was not federal constitutional error; and any error in omitting the instruction was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

We also hold the trial court did not err in admitting the victim's hearsay statements as dying declarations or in failing sua sponte to instruct the jury in accordance with CALJIC No. 8.73 that provocation may be considered in determining whether the homicide in this case was a first degree or second degree murder. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

An amended information charged Mayo with a single count of murder, identifying the victim as Gregory McHenry, and specially alleged that Mayo

---

satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 220, approved for use as of January 1, 2006, after the trial in this case, provides: "The fact that a criminal charge has been filed against the defendant[s] is not evidence that the charge is true. You must not be biased against the defendant[s] just because (he/she/they) (has/have) been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime [and special allegation] beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise]. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant[s] guilty beyond a reasonable doubt, (he/she/they) (is/are) entitled to an acquittal and you must find (him/her/them) not guilty."

personally used and discharged a firearm in committing the offense. (Pen. Code, § 12022.53, subds. (b), (c), & (d).)[2] It further alleged Mayo had one prior serious or violent felony conviction within the meaning of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).) Mayo pleaded not guilty and requested a jury trial.

According to the evidence presented at trial, McHenry was shot 11 times as he sat on the couch in the living room of Carl Combs's apartment. Immediately after the shooting and while McHenry lay bleeding from his mortal wounds, McHenry screamed at Combs, "Why did you let 'Q' [Mayo's nickname] blast me?" Combs, who was in the kitchen at the time of the shooting and did not see McHenry's assailant, reported McHenry's outburst to police during a taped interview. At trial, however, Combs denied that McHenry had identified Mayo and testified McHenry had actually said (and Combs had accurately reported to police), "Why did you let *him* blast me?"[3]

Khristie Chong was outside the apartment, heard the shots and saw Mayo leave the apartment soon after the shots were fired. Reginald Carter, Combs's neighbor, told police he was at home at the time of the shooting and saw Mayo, a regular visitor to Combs's apartment, fleeing Combs's apartment following the gunshots. At trial Carter denied he was at home when McHenry was shot. Brian Jarukadruta, who was at the apartment at the time of the shooting, told Chong (his sister) and others "Q" was the shooter, although Jarukadruta denied at trial he had seen McHenry's assailant or had said "Q" was the shooter. There was also testimony Mayo and McHenry had been engaged in a feud for weeks over McHenry's boasting that he had slept with Mayo's wife in exchange for providing her with drugs and that the two men had resumed their quarrel the day of the shooting. McHenry and Mayo were both members of the "By Yourself Hustlers Gang." Several witnesses expressed fears about testifying in this case involving gang members. After the shooting, Mayo fled to Arizona and then to Georgia.

Mayo did not testify. Defense counsel advanced the theory that someone else had shot McHenry. Witnesses testified that as many as 30 people went into and out of Combs's residence the day of the shooting. One witness testified he had heard shots and later saw four Black males in their mid-20's run out of the apartment and into a black truck. Los Angeles County Police Department Detective William Dunn, who interviewed Combs the day of the shooting, testified Combs had told him McHenry had many enemies.

---

[2] Statutory references are to the Penal Code unless otherwise indicated.

[3] The audio tape of Combs's interview with police was played at trial and a transcript of its contents provided to the jurors. That transcript reveals Combs initially told police McHenry had used the pronoun "him" to refer to his assailant, but later in the interview told police McHenry had actually said "Q" had shot him.

The jury found Mayo guilty of first degree murder and found the firearm allegation to be true. After Mayo waived his right to jury trial on the prior strike allegation, the trial court found the allegation to be true, but exercised its discretion to dismiss the strike under section 1385. The trial court sentenced Mayo to an aggregate state prison term of 50 years to life, consisting of 25 years to life for the base offense plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).[4]

## DISCUSSION

Mayo contends the trial court's inadvertent omission of CALJIC No. 2.90's definition of reasonable doubt and explanation of the presumption of innocence is federal constitutional error that is either structural in nature and therefore reversible per se (*Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] (*Sullivan*)) or, at minimum, is not harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*)). Although the omission of CALJIC No. 2.90 may amount to federal constitutional error when a jury is not adequately instructed as to both the constitutional burden of proof and the requirement that guilt be determined solely on the evidence presented, as we explain below, those circumstances do not exist in this case.[5]

1. *Governing Law: Due Process, Beyond a Reasonable Doubt and the Presumption of Innocence*

a. *The reasonable doubt standard*

The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution protect a criminal defendant from conviction

---

[4] The jury also found true the enhancements alleged under section 12022.53, subdivisions (b) and (c), but the court stayed the sentence for those enhancements pursuant to section 654.

[5] Before commencing the voir dire examination, the trial court read CALJIC No. 2.90 to the entire panel of prospective jurors and reiterated the requirements of reasonable doubt and the presumption of innocence several times throughout the voir dire process. Prior to the close of evidence, the trial court also stated its intent to include CALJIC No. 2.90 as part of the deliberation instructions to be given to the impaneled jury, but apparently through inadvertence failed to include CALJIC No. 2.90 in the written or oral jury instructions. Reading CALJIC No. 2.90 to the panel of prospective jurors, by itself, does not satisfy the requirement that the impaneled jury be adequately instructed with the concepts of reasonable doubt and the presumption of innocence. (*People v. Vann* (1974) 12 Cal.3d 220, 226 [115 Cal.Rptr. 352, 524 P.2d 824] [giving CALJIC No. 2.90 to the panel of prospective jurors, by itself, was insufficient to advise the jury of the principles of reasonable doubt and the presumption of innocence]; *People v. Elguera* (1992) 8 Cal.App.4th 1214, 1220 [10 Cal.Rptr.2d 910] [same]; *People v. Crawford* (1997) 58 Cal.App.4th 815, 820 [68 Cal.Rptr.2d 546] [same].)

except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. (*Sullivan, supra,* 508 U.S. at p. 278; see also *In re Winship* (1970) 397 U.S. 358, 363–364 [25 L.Ed.2d 368, 90 S.Ct. 1068] ["The requirement of proof beyond a reasonable doubt has [a] vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt."].)

Although the reasonable doubt standard is an integral part of the criminal defendant's due process guarantee, there is no federal constitutional requirement that trial courts define reasonable doubt. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5 [127 L.Ed.2d 583, 114 S.Ct. 1239] ["The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."]; *United States v. Nolasco* (9th Cir. 1991) 926 F.2d 869, 872; *United States v. Garza* (9th Cir. 1992) 980 F.2d 546, 555; see also *Holland v. United States* (1954) 348 U.S. 121, 140 [99 L.Ed. 150, 75 S.Ct. 127] [" 'Attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury.' "].) Thus, while an instruction that lowers the People's burden of proof or detracts from the heavy burden suggested by use of the term "reasonable doubt" is federal constitutional error requiring reversal per se (see *Sullivan, supra,* 508 U.S. at p. 279 [when there is no conviction beyond a reasonable doubt because of a constitutionally deficient definition of reasonable doubt, error not amenable to harmless error analysis]), omission of a constitutionally acceptable definition of reasonable doubt is federal constitutional error only when the instructions given to the jury, taken as a whole, fail to otherwise adequately convey the concept of reasonable doubt. (*Victor,* at p. 5 ["[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' [Citation.]"].)

b. *The presumption of innocence*

■  The "presumption of innocence"—a "shorthand description of the right of the accused to 'remain inactive and secure' " until the People have met their burden of proof—is inherent in the reasonable doubt standard.

*(Taylor v. Kentucky* (1978) 436 U.S. 478, 483 [56 L.Ed.2d 468, 98 S.Ct. 1930] *(Taylor);* see *ibid.* [" '[T]o say . . . that the opponent of a claim or charge is presumed not to be guilty is to say in another form that the proponent of the claim or charge must evidence it' " in accordance with the requisite burden of proof].) Yet, while the presumption of innocence and the People's burden of proof are logically similar, the courts and legal scholars recognize that, for the lay juror, the presumption of innocence may convey an additional caution, admonishing jurors to " 'put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced.' " *(Taylor,* at p. 485, quoting 9 Wigmore, Evidence (3d ed. 1940) § 2511, p. 407.)

Due process likewise requires that guilt be determined only on the evidence presented at trial, not on suspicion, defendant's status or facts outside the evidence. *(Taylor, supra,* 436 U.S. at p. 487; *Estelle v. Williams* (1976) 425 U.S. 501, 503 [48 L.Ed.2d 126, 96 S.Ct. 1691].) Although the presumption-of-innocence instruction has long been held to convey that concept, there is no constitutional mandate that juries be instructed specifically on the presumption of innocence in every case. *(Kentucky v. Whorton* (1979) 441 U.S. 786, 789 [60 L.Ed.2d 640, 99 S.Ct. 2088] ["failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution"].) Rather, the presumption-of-innocence instruction "simply represents one means of protecting the accused's constitutional right to be judged solely on the basis of proof adduced at trial." *(Taylor,* at p. 486; see also *People v. Hawthorne* (1992) 4 Cal.4th 43, 72 [14 Cal.Rptr.2d 133, 841 P.2d 118].) When such an instruction is omitted or rejected by the trial court, the relevant inquiry for determining federal constitutional error is whether, in light of the totality of the circumstances, including all the instructions given to the jury, the arguments of counsel and weight of the evidence, the omission of the instruction deprived defendant of a constitutionally fair trial. *(Kentucky,* at p. 789; *Taylor,* at p. 490; see also *Hawthorne,* at p. 72.)

2. *The Omission of CALJIC No. 2.90 Was Not Federal Constitutional Error in Light of the Other Instructions Given in This Case*

a. *The jury was adequately informed of the due process requirement that Mayo's guilt be proved beyond a reasonable doubt*

Relying on *People v. Vann* (1974) 12 Cal.3d 220 [115 Cal.Rptr. 352, 524 P.2d 824] *(Vann),* Mayo insists the omission of CALJIC No. 2.90 in this case is federal constitutional error because the jury was not provided a constitutionally adequate reasonable doubt instruction. In *Vann* (a case involving receipt of stolen property) the trial court inadvertently omitted

CALJIC No. 2.90 from the oral and written instructions given to the impaneled jury prior to deliberations. The defendant argued the omission deprived him of the constitutionally mandated reasonable doubt standard of proof required in criminal cases. The People conceded error, but argued the error was not prejudicial because the jury had been given other instructions referring to the reasonable doubt standard. In particular, the jury was instructed it must not find the defendant guilty " 'based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish a defendant's guilt has been proved beyond a reasonable doubt.' " (*Vann*, at p. 226.) The jury was also instructed that " 'evidence of good character may be sufficient to raise a reasonable doubt whether a defendant is guilty, which doubt otherwise would not exist.' " (*Id.* at p. 227.)

The Supreme Court held the instructions given "f[e]ll far short of apprising the jurors that defendants were entitled to acquittal unless each element of the crimes charged was proved to the jurors' satisfaction beyond a reasonable doubt." (*Vann, supra,* 12 Cal.3d at p. 227.) Because much of the evidence in *Vann* was direct, the instruction explaining the application of the reasonable doubt standard to circumstantial evidence might have led the jury to believe a lesser standard of proof was to be applied for direct evidence. (See *id.* at pp. 226–227 ["The prosecution in the instant case depended in large part on direct evidence . . . . An instruction which requires proof beyond a reasonable doubt only as to circumstantial evidence, rather than importing a need for the same degree of proof where the crime is sought to be established by direct evidence, might with equal logic have been interpreted by the jurors as importing the need of a lesser degree of proof where the evidence is direct and thus of a higher quality."].) Likewise, the instruction on character evidence "did not expressly tell [the jury] that a reasonable doubt based upon such testimony would necessitate acquittal nor did it assist them in evaluating issues or conflicts other than character." (*Id.* at p. 227.) Finding none of the instructions sufficient to apprise the jury of the constitutional requirement that each and every element of the charged offense be proved beyond a reasonable doubt, the court held the omission of CALJIC No. 2.90 amounted to federal constitutional error that was not harmless beyond a reasonable doubt. (*Vann*, at p. 228.)[6]

---

[6] *Vann, supra,* 12 Cal.3d 220, which was decided almost 20 years prior to the United States Supreme Court's opinion in *Sullivan, supra,* 508 U.S. 275, applied harmless error analysis under *Chapman, supra,* 386 U.S. 18, and did not address whether the failure to adequately apprise the jury of the concept of reasonable doubt amounted to structural error. (Cf. *Sullivan,* at p. 280 [A constitutionally deficient reasonable doubt instruction is not amenable to harmless error analysis: "There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question

In sharp contrast to *Vann* the instructions in the instant case fully and repeatedly informed the jurors that Mayo was entitled to an acquittal unless each element of the crime charged was proved beyond a reasonable doubt. The jury was properly instructed as to the elements of murder in accordance with CALJIC Nos. 8.10 and 8.11 and told, in accordance with CALJIC No. 8.50, "To establish that a killing was murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder . . . ."[7] The jury was then instructed with CALJIC No. 8.71, "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." The jury was also instructed as to voluntary manslaughter (CALJIC No. 8.43) and informed, in accordance with CALJIC Nos. 8.72 and 8.75,[8] that, if it had reasonable doubt as to whether the crime was murder or the lesser-included offense of manslaughter, it had to resolve that doubt by finding the crime to be manslaughter rather than murder, provided it was "satisfied beyond a reasonable doubt that [Mayo was] guilty of the lesser crime" (CALJIC No. 8.75).[9]

---

whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless."].)

[7] The full text of CALJIC No. 8.50, as provided to the jury, states: "The distinction between murder and manslaughter is that murder requires malice while manslaughter does not. [¶] When the act causing death, though unlawful, is done in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation, the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent. [¶] To establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel."

[8] CALJIC No. 8.72 provides: "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but you unanimously agree that you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of the doubt and find it to be manslaughter rather than murder."

CALJIC No. 8.75 provides: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime of first degree murder . . . and you unanimously so find, you may convict [him] [her] of any lesser crime provided you are satisfied beyond a reasonable doubt that [he][she] is guilty of the lesser crime. [¶] . . . [¶] Thus you are to determine whether the defendant is guilty or not guilty of murder in the first degree or of any lesser crime thereto. . . ."

[9] The jury was also instructed with CALJIC No. 2.61: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against [him] [her]. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against [him] [her] on any essential element." In addition, the jury was given CALJIC No. 17.19.5: The People have the burden of proving the truth of the personal use allegation and, "if you have reasonable doubt that it is true, you must find it to be not true."

Taken together, those instructions informing the jury it had to acquit Mayo of murder unless each and every element of murder (including first degree murder) was proved beyond a reasonable doubt plainly distinguish this case not only from *Vann, supra,* 12 Cal.3d 220, but also from those appellate court decisions relying on *Vann* to hold the omission of CALJIC No. 2.90 was federal constitutional error. (See, e.g., *People v. Crawford* (1997) 58 Cal.App.4th 815 [68 Cal.Rptr.2d 546] (*Crawford*); *People v. Phillips* (1997) 59 Cal.App.4th 952 [69 Cal.Rptr.2d 532] (*Phillips*); *People v. Elguera* (1992) 8 Cal.App.4th 1214 [10 Cal.Rptr.2d 910] (*Elguera*).) In each of those cases, the instructions did "fall far short" of informing the jury it had to acquit unless it found each and every element of the charged offense beyond a reasonable doubt.

For example, in *Crawford, supra,* 58 Cal.App.4th 815 (a robbery case), CALJIC No. 2.90 was inadvertently omitted from the instructions and no other instruction informed the jury that each of the elements of robbery (or its lesser included offense) had to be proved beyond a reasonable doubt. Characterizing *Vann* as a "strikingly similar case," the Court of Appeal explained that neither the reference to reasonable doubt in the circumstantial evidence instruction nor in the closing arguments of both the prosecutor and defense counsel was constitutionally sufficient to inform the jurors the defendant was entitled to acquittal unless each element of robbery was proved to the jurors' satisfaction beyond a reasonable doubt. (*Id.* at p. 825.) Underscoring the problem, the court observed, was the fact the jury had been instructed on reasonable doubt as to the special allegation of use of a deadly or dangerous weapon in the course of the robbery and had found the allegation not to be true. "One can only speculate as to what the jurors would have done had they been admonished to find guilt only if they were convinced beyond a reasonable doubt on the robbery count . . . ." (*Ibid.*)

The instructions in *Elguera, supra,* 8 Cal.App.4th 1214 (Werdegar, J.), a case involving a prosecution for possession of a sharp instrument while confined in state prison, suffered from the same defect. The jury was given a circumstantial evidence instruction and advised of the burden of proof in counsels' closing arguments, but was not given CALJIC No. 2.90 or any other instruction informing it the People had the burden of proving every element of the charged offense beyond a reasonable doubt. (See *Elguera,* at pp. 1220–1222.)

In *Phillips, supra,* 59 Cal.App.4th 952 (involving a prosecution for infliction of corporal injury on a cohabitant and the unlawful taking of a vehicle) CALJIC No. 2.90 was again inadvertently omitted from the instructions given

to the impaneled jury. Relying on *Vann, supra,* 12 Cal.3d 220, the Court of Appeal held that references to the burden of proof in instructions pertaining to the defendant's failure to testify[10] and to lesser included offenses[11] were insufficient to advise the jury of the constitutional burden of proof in a criminal case. (*Phillips,* at pp. 956–958.)

*Phillips, supra,* 59 Cal.App.4th 952, actually presents a somewhat closer question than *Vann, supra,* 12 Cal.3d 220. Unlike the limited references to reasonable doubt in *Vann,* the instructions in *Phillips* informed the jury of the People's burden of proving "every essential element of the charge" against the defendant beyond a reasonable doubt. Still, that reference to reasonable doubt was made in the context of narrower instructions pertaining to the defendant's failure to testify and, arguably, lacked the requisite scope of a proper instruction on the People's burden of proof in the case. Likewise, the references to reasonable doubt in CALJIC No. 17.10 informed the jury of the burden of proof but did not explain that burden extended to proving every element of the charged offense.

Those problems, as well as those identified in *Vann, Crawford* and *Elguera*—the absence of instructions advising the jury the People have the burden of proving each of the facts comprising the charged offense beyond a reasonable doubt—do not exist in this case. Here, the references to reasonable doubt related to the murder charge itself and directly informed the jury that, to convict Mayo of murder, it had to find each and every element of that charge beyond a reasonable doubt.

Implicitly recognizing the difference between the inadequate instructions in *Vann* and cases following it and the reasonable doubt instructions actually given in the case at bar, Mayo suggests reversal is required because, even if the instructions adequately informed the jury of the due process requirement that the People prove the elements of the charged offense beyond a reasonable doubt, the omission of CALJIC No. 2.90 left the concept of reasonable doubt undefined. (See *Vann, supra,* 12 Cal.3d at p. 227 ["The foregoing references to reasonable doubt in isolated applications of that standard of proof fall far short of apprising the jurors that defendants were entitled to acquittal unless each element of the crimes charged was proved to the jurors' satisfaction beyond a reasonable doubt, *buttressed by additional instructions*

---

[10] The jury was instructed with CALJIC No. 2.61, "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him . . . ."

[11] The jury was instructed with CALJIC No. 17.10, "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him . . . of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of such lesser crime."

*on the meaning of that phrase*" (italics added)]; see also *Elguera, supra,* 8 Cal.App.4th at p. 1223 ["[T]he jury was not provided, in the oral or written charge, any *definition* of reasonable doubt. . . . [¶] Even assuming, therefore, the jurors applied a standard of 'proof beyond a reasonable doubt,' it is impossible to know whether the effective lack of a definition of the standard affected their application of it."].)

■ To the extent Mayo is correct in asserting that *Vann* holds the omission of a definition of reasonable doubt is federal constitutional error,[12] the United States Supreme Court has since made clear the United States Constitution does not require trial courts to define reasonable doubt, provided the jury is informed of the constitutionally correct standard of proof. (*Victor v. Nebraska, supra,* 511 U.S. at p. 5 [Constitution does not require trial court to define reasonable doubt "as a matter of course"]; see generally *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325–326 [109 Cal.Rptr.2d 851, 27 P.3d 739] [intervening U.S. Supreme Ct. authority interpreting U.S. Const. supersedes contrary prior Cal. Supreme Ct. authority on issue]; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 720 [257 Cal.Rptr. 708, 771 P.2d 406] [same].) The concept of reasonable doubt having been adequately conveyed in this case, there is no basis to find the omission of CALJIC No. 2.90's definition of reasonable doubt as "an abiding conviction of the truth of the charge" was federal constitutional error.[13]

In reaching this conclusion we do not intend to suggest the omission of the reasonable doubt instruction contained in CALJIC No. 2.90 or CALCRIM No. 220 will never be federal constitutional error. Indeed, as *Vann, supra,* 12 Cal.3d 220, *Crawford, supra,* 58 Cal.App.4th 815, *Elguera, supra,* 8 Cal.App.4th 815, and *Phillips, supra,* 59 Cal.App.4th 952 attest, the omission

---

[12] It has been suggested the quoted language in *Vann, supra,* 12 Cal.3d at page 227, is dicta. (See, e.g., *People v. Brigham* (1979) 25 Cal.3d 283, 315, fn. 19 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.) ["[I]n *People v. Vann* (1974) 12 Cal.3d 220, 227 [115 Cal.Rptr. 352, 524 P.2d 824], this court stated somewhat obliquely that a defendant is entitled to an instruction on the requirement of proof beyond a reasonable doubt 'buttressed by additional instructions on the meaning of that phrase.' [Fn. omitted.] The quoted words were plainly dicta, however, unsupported by either analysis or authority."].)

[13] In *Phillips, supra,* 59 Cal.App.4th 952, and to some extent in *Crawford, supra,* 58 Cal.App.4th 815 (both of which were decided after the United States Supreme Court's decision in *Sullivan, supra,* 508 U.S. pp. 279–281), the omission of CALJIC No. 2.90 was held to be no less a constitutional defect than the constitutionally deficient reasonable doubt instruction in *Sullivan,* and, therefore, structural error. (*Phillips,* at p. 958; *Crawford,* at p. 826.) We do not reach the question whether the omission of CALJIC No. 2.90 when that omission constitutes federal constitutional error is structural error, or alternatively, amenable to the harmless error analysis of *Chapman, supra,* 386 U.S. 18, because, in this case, the jury was adequately instructed that, in order to convict Mayo of murder, it had to find each and every element of the murder offense proved beyond a reasonable doubt.

of the standard reasonable doubt instruction may well be federal constitutional error absent other instructions adequately informing the jury of the correct standard of proof. We hold only that under the specific facts of this case, the omission of the definition of reasonable doubt contained in CALJIC No. 2.90 does not constitute federal constitutional error.

b. *Omission of CALJIC No. 2.90's presumption-of-innocence admonition is not federal constitutional error*

Relying on *Taylor, supra,* 436 U.S. 478, Mayo also argues the omission of CALJIC No. 2.90's presumption-of-innocence admonition violated his right to due process. In *Taylor* the United States Supreme Court held the trial court's denial of a requested presumption-of-innocence instruction deprived the defendant of a fair trial. In reaching its conclusion, the court emphasized the People had repeatedly invited the jury (in its opening statement and closing argument) to draw inferences of the defendant's guilt from facts not in evidence and from the defendant's arrest and indictment. According to the court, the People's "repeated suggestions that petitioner's status as a defendant tended to establish his guilt created a genuine danger that the jury would convict petitioner on the basis of those extraneous considerations, rather than on the evidence introduced at trial." (*Taylor*, at pp. 487–488.) The trial court exacerbated the problem when it refused defendant's request to instruct the jury that the indictment was not evidence. (*Id.* at p. 488, fn. 15.) Considering the totality of the circumstances, including the arguments of counsel and the absence of instructions that would have admonished the jury not to draw inferences based on the defendant's arrest, indictment or resulting trial, the court held the denial of the requested presumption-of-innocence instruction deprived the defendant of his due process right to have his guilt or innocence "determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." (*Id.* at p. 485; see also *id.* at p. 490.)

A year after its opinion in *Taylor, supra,* 436 U.S. 478, the Supreme Court granted certiorari in a case in which the Kentucky Supreme Court had relied on *Taylor* to reverse a judgment for failure to give a presumption-of-innocence instruction. The court clarified, "[T]he failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution." (*Kentucky v. Whorton, supra,* 441 U.S. at p. 789.) Rather, whether the denial of the instruction violates due process must be evaluated in light of the totality of the circumstances to determine whether the failure to give the instruction deprived the defendant of a fair trial. (See *id.* at pp. 789–790.) On remand the Kentucky Supreme Court upheld the judgment, holding that, under the totality of the circumstances (which included a proper

reasonable doubt instruction), the denial of a presumption-of-innocence instruction was not federal constitutional error. (See *Whorton v. Commonwealth* (Ky. 1979) 585 S.W.2d 388, rehg. den., *sub nom. Kentucky v. Whorton* (1979) 444 U.S. 887 [62 L.Ed.2d 121, 100 S.Ct. 186].)

In the instant case the jury was not only fully apprised of its responsibility to acquit Mayo unless it found every element of the charged offense beyond a reasonable doubt, but also, unlike in *Taylor, supra,* 436 U.S. 478, was properly informed (in accordance with CALJIC Nos. 1.00 and 1.03) of the constitutional requirement that guilt be judged solely on the evidence presented and not inferred from facts such as defendant's arrest or resulting trial.[14] Arguments of counsel did not invite the jury to consider facts outside the evidence or to infer guilt from the arrest, charges or the resulting trial. Evaluating the omission of CALJIC No. 2.90's presumption-of-innocence instruction under the totality of the circumstances (*Kentucky v. Whorton, supra,* 441 U.S. at p. 789; *People v. Hawthorne, supra,* 4 Cal.4th at p. 72), we conclude the omission of the instruction did not deprive Mayo of a fair trial.

3. *Any Error in the Court's Inadvertent Omission of CALJIC No. 2.90 Was Harmless*

Although the omission of CALJIC No. 2.90 was not federal constitutional error in this case, the question remains whether its omission was error at all and, if so, whether it was prejudicial.[15] The Attorney General concedes error. (See *Vann, supra,* 12 Cal.3d at p. 226 [trial court has sua sponte duty to instruct on basic principles of reasonable doubt and presumption of innocence].) However, any error in this case was harmless under *People v. Watson,*

---

[14] CALJIC No. 1.00 provides: "[¶] . . . [¶] You have two duties to perform. First you must determine what facts have been proved from the evidence received in the trial and not from any other source. A 'fact' is something proved by the evidence or by stipulation. . . . [¶] . . . [¶] You must not be influenced by pity for or prejudice against a defendant. You must not be biased against a defendant because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that a defendant is more likely to be guilty than not guilty. You must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and a defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences."

CALJIC No. 1.03 provides: "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. . . . [¶] You must not independently investigate the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you must not on your own visit the scene, conduct experiments, or consult reference works or persons for additional information. . . ."

[15] As previously noted, the trial court read CALJIC No. 2.90 to the prospective jury panel, but, apparently through inadvertence, failed to give that instruction to the impaneled jury.

*supra,* 46 Cal.2d 818. (See *People v. Hawthorne, supra,* 4 Cal.4th at p. 73 ["while we agree the trial court should have given" the presumption-of-innocence-type instruction contained in CALJIC No. 1.00 as a "precautionary reminder that the jury focus their attention on the evidence in resolving defendant's fate, the lapse was not prejudicial" under *Watson*].)

Here, the evidence of guilt was strong. Mayo was at the apartment at the time of the shooting and was observed fleeing the apartment immediately after the shooting. Just after he was shot, McHenry identified his assailant in a dying declaration, screaming at Combs, "Why did you let 'Q' blast me?"[16] Mayo's nickname was "Q," and people he knew referred to him as "Q." Mayo and McHenry had been feuding for weeks and had been quarrelling just prior to the shooting. Jarukadruta told his sister and other acquaintances he had been at the apartment at the time of the shooting and "Q" was the shooter. Although Combs testified he never told police McHenry had identified "Q" as the shooter (instead, he told police McHenry had said, " 'Why did you let *him* blast me?' ") and Jarukadruta denied at trial telling anyone "Q" was the shooter, the jury, informed by other evidence of Mayo's efforts to intimidate people not to testify and hearing the tape of Combs's police interview, resolved that conflict in the evidence against Mayo.

The jury was properly instructed that, to convict Mayo of murder in the first degree, it had to find each and every element of murder, as well as the elements of premeditation and deliberation, beyond a reasonable doubt and in accordance with the evidence presented. Although the jury was not told "reasonable doubt" means "they cannot say they feel an abiding conviction of the truth of the charge," it is not reasonably probable the inclusion of that arcane definition would have led to a more favorable verdict for Mayo. As Justice Mosk observed in his concurring opinion in *People v. Brigham* (1979) 25 Cal.3d 283, 299 [157 Cal.Rptr. 905, 599 P.2d 100], the phrase " 'abiding' conviction" has an "antique ring" that, although current in 1850, has "long since fallen into disuse" and leaves jurors confused about its intended meaning. (*Ibid.*) If anything, the phrase raises more questions than it answers: What is an abiding conviction? " 'One that has abode, for a considerable time, or one that is going to abide? How long before rendering the verdict must the conviction expressed by it have been formed? A week, a day, an hour, five minutes? If the abidingness is future, by what faculty does the juror know that it is going to abide? By what quality of the conviction does he

---

[16] Mayo challenges the admission of this evidence, claiming it was inadmissible hearsay and violated his constitutional right to confrontation. As discussed in part 4, below, the trial court did not err in admitting that evidence.

recognize its longevity? By its strength? By its defiance of past argument in the jury-room? Who knows?' [Citation.]" (*Ibid.*)

The United States Supreme Court, as well as several federal and state appellate courts, have acknowledged the lack of practical utility in defining reasonable doubt, " 'Attempts to explain the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury.' " (*Holland v. United States, supra,* 348 U.S. at p. 140.) "Jurors know what is 'reasonable' and are quite familiar with the meaning of 'doubt.' Judges' and lawyers' attempts to inject other amorphous catch-phrases into the 'reasonable doubt' standard . . . only muddy the water. . . ." (*United States v. Glass* (7th Cir. 1988) 846 F.2d 386, 387; see also *People v. Barkas* (1912) 255 Ill. 516 [99 N.E. 698, 702–703] ["The term 'reasonable doubt' has no other or different meaning in law than it has when used in any of the ordinary transactions or affairs of life. It is doubtful whether any better definition of the term can be found than the words themselves."]; *Missouri v. Taylor* (Mo. 1972) 486 S.W.2d 239, 244 [" 'It is difficult to explain simple terms like 'reasonable doubt' so as to make them plainer.' " " 'Reasonable doubt is reasonable doubt, and that is about all that can be said in regard to it.' "]; *United States v. Moss* (4th Cir. 1985) 756 F.2d 329, 333 ["Recognizing that little can be gained from attempts to define reasonable doubt, while admitting that added confusion is often created by these well-intentioned judicial efforts, we join in the general condemnation of trial court attempts to define reasonable doubt in their jury instructions."].)

The jury was instructed the People bore the burden of proving each element of the charged crime beyond a reasonable doubt, that Mayo's failure to testify did not relieve the People of that burden and that its determination as to whether the People had met their burden must be based on the evidence presented. Moreover, this is not a case in which the jury was unfamiliar with the concepts of reasonable doubt and the presumption of innocence. CALJIC No. 2.90 was read to the entire panel of prospective jurors before the trial court commenced the voir dire examination; and, as Justice Johnson correctly observes in his concurring opinion, the principles of reasonable doubt and presumption of innocence were repeated and explained numerous times throughout the voir dire process. Finally, none of the arguments of counsel invited jurors to consider facts outside the evidence. In light of the instructions given and the evidence presented at trial, it is not reasonably probable the omission of CALJIC No. 2.90's definition of reasonable doubt as the absence of an "abiding conviction in the truth of the charge" and its admonition of the presumption of innocence affected the verdict. (*Watson, supra,* 46 Cal.2d at p. 836; see also *People v. Hawthorne, supra,* 4 Cal.4th at p. 73.)

### 4. *The Trial Court Did Not Err in Admitting the Victim's Hearsay Statement Identifying the Killer*

Mayo contends the trial court erred in admitting evidence that, after McHenry was shot, he screamed at Combs, "Why did you let 'Q' blast me?" Mayo argues, as he did below, the evidence does not satisfy the dying declaration exception to the hearsay rule (Evid. Code, § 1242) and, even if it did, it violated his constitutional right to confrontation as articulated by the Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]. We review the trial court's determination as to the admissibility of evidence (including the application of the exceptions to the hearsay rule) for abuse of discretion (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. Karis* (1988) 46 Cal.3d 612, 637 [250 Cal.Rptr. 659, 758 P.2d 1189]) and the legal question whether admission of the evidence was constitutional de novo (*People v. Cromer* (2001) 24 Cal.4th 889, 893–894 [103 Cal.Rptr.2d 23, 15 P.3d 243]).

#### a. *The trial court did not abuse its discretion in concluding McHenry's statement was a dying declaration*

■ Evidence of a statement made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay and ordinarily inadmissible. (Evid. Code, § 1200.) However, there is an exception to the hearsay rule for dying declarations: "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death." (Evid. Code, § 1242.) A declarant's knowledge of his or her impending death need not be established by direct evidence, but may be proved by all the circumstances, including the declarant's physical condition, the nature and seriousness of his or her wounds, the declarant's knowledge of his or her grave condition or other circumstances of the case. (*People v. Monterroso* (2004) 34 Cal.4th 743, 763 [22 Cal.Rptr.3d 1, 101 P.3d 956] (*Monterroso*); *People v. Sims* (1993) 5 Cal.4th 405, 457 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *People v. Tahl* (1967) 65 Cal.2d 719, 727 [56 Cal.Rptr. 318, 423 P.2d 246].)

Mayo contends the evidence failed to establish McHenry made the statement identifying "Q" as the shooter while under a sense of his immediately impending death. He argues McHenry never gave any indication he thought he was dying and made no pleas that his life be saved. Although there was no direct evidence of McHenry's belief as to his impending death, there was abundant circumstantial evidence to that effect. McHenry was shot multiple times from close range, suffering 11 gunshot wounds to his back, arms, legs, and hips, two of which proved fatal. As he lay bleeding from his mortal

wounds, McHenry told Combs he felt really hot and wanted a fan to cool himself down. McHenry's condition so scared Combs he feared McHenry would go into shock. McHenry also sensed the gravity of his condition, asking Combs whether he had been shot in the head. Under the circumstances the trial court did not abuse its discretion in determining McHenry believed he was going to die from his wounds at the time he made the statements.[17]

### b. The admission of the dying declaration did not violate Mayo's constitutional right to confrontation

■ In *Crawford v. Washington, supra,* 541 U.S. 36, the United States Supreme Court, repudiating its prior holding in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], held use of an out-of-court statement that is testimonial in nature is prohibited by the Sixth Amendment's confrontation clause whether or not the statement is inherently reliable or meets an established exception to the hearsay rule unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. (*Crawford,* at p. 61 ["Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rule of evidence, much less to amorphous notions of 'reliability.' "].) *Crawford* relied heavily on the right of confrontation as it existed at common law at the time of our nation's founding and left open the possibility that testimonial dying declarations, which were admissible at common law, could be admissible without violating the confrontation clause: "The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*" (*Id.* at p. 56, fn. 6.)

In *Monterroso, supra,* 34 Cal.4th 743, the California Supreme Court directly answered the question left open in *Crawford v. Washington, supra,* 541 U.S. 36, holding explicitly that the admission into evidence of dying declarations, even if testimonial in nature, does not violate a criminal defendant's Sixth Amendment right to confrontation. "[I]f, as *Crawford* teaches, the confrontation clause 'is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding' [citations], it follows that the common

---

[17] Mayo has requested this court take judicial notice of the transcript of the first preliminary hearing in this case, suggesting its contents would be informative in evaluating the prejudicial effect of the admission of McHenry's statement. In light of our holding that McHenry's dying declaration was not admitted in error, we deny the request.

law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment. We therefore conclude the admission of [the victim]'s dying declaration was not error." (*Monterroso,* at p. 765.) *Monterosso* thus disposes of Mayo's contention that admission of McHenry's dying declaration violated his Sixth Amendment right to confrontation.[18]

### 5. The Trial Court Had No Obligation, Sua Sponte or Otherwise, to Instruct the Jury with CALJIC No. 8.73 on Provocation

■ Relying on the People's evidence that Mayo and McHenry had quarreled throughout the day of the shooting,[19] Mayo contends that, in addition to the second degree murder and voluntary manslaughter instructions given in this case, the trial court had a sua sponte duty to instruct the jury with CALJIC No. 8.73 that provocation may be considered in determining whether a homicide is first degree or second degree murder.[20] The California Supreme Court has rejected that argument, holding "CALJIC No. 8.73 is a 'pinpoint' instruction [citation] that relates particular facts to an element of the charged crime [premeditation and deliberation] and thereby explains or highlights a defense theory. [Citation.] The trial court is not required to give [CALJIC No. 8.73] on its own initiative . . . ." (*People v. Mayfield* (1997) 14 Cal.4th 668, 778 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see also *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732–1733 [34 Cal.Rptr.2d 723] [same]; *People v. Middleton* (1997) 52 Cal.App.4th 19, 31–33 [60 Cal.Rptr.2d 366], disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752 [3 Cal.Rptr.3d 676, 74 P.3d 771]; cf. *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588] [instruction informing jury voluntary intoxication may negate elements of premeditation and deliberation is pinpoint instruction, and trial court has no duty to give it sua sponte].)[21]

---

[18] As in *Monterroso, supra,* 34 Cal.4th at page 765, in light of our holding we need not decide whether McHenry's dying declaration was testimonial in nature. (See *ibid.*)

[19] According to evidence at trial, McHenry and Mayo had quarreled for weeks over McHenry's boasting that he had slept with Mayo's wife in exchange for providing her with drugs. The quarrel continued the day of the shooting. That day, McHenry was in a leg cast on the couch when Mayo arrived at Combs's apartment. The two men resumed their ongoing argument. Then McHenry told Mayo if he had his gun, he would "smoke him." Mayo, upset that McHenry had threatened his life, left the house, then returned with a gun 20 minutes later and, seemingly "calm," shot McHenry.

[20] CALJIC No. 8.73 provides: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation or premeditation."

[21] Although language in *People v. Johnson* (1993) 6 Cal.4th 1, 42–43 [23 Cal.Rptr.2d 593, 859 P.2d 673] (citing *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]) may be read to suggest that the provocation instruction in

Accordingly, the trial court's failure sua sponte to instruct the jury with CALJIC No. 8.73 was not error.

## DISPOSITION

The judgment is affirmed.

Zelon, J., concurred.

JOHNSON, J., Concurring.—I concur in the judgment but write separately to explain some independent reasons for finding what I regard as extremely serious error to have been harmless in this case and also to emphasize trial courts should not misread this decision as evidencing a lax attitude toward failures to explain reasonable doubt or the presumption of innocence.

In criminal trials, among the most critical and most difficult concepts the trial judge must convey to the jury are, first, the defendant enters the courtroom an innocent person and, second, the defendant can only be convicted if the prosecution produces evidence of guilt so overwhelming it exceeds an extremely high threshold—erasing all reasonable doubt.

These twin concepts are critical because they are the best, indeed often the only, protection against the punishment of innocent people by jurors who otherwise might be tempted to convict those the authorities have charged with crimes merely because they are so charged or on the basis of evidence that only establishes a bare probability of guilt. These concepts are also difficult, because for most jurors they are counter to their ordinary decisionmaking processes. In their daily lives, those serving on juries typically assess options and make decisions on the basis of probabilities (or sometimes just hunches). They are accustomed to electing the choice that seems probably correct even if only slightly more so than the competing option. In reaching many of those decisions, they also rely on probability assessments they receive from experts and authority figures—doctors, teachers, and the like.

When entering a criminal courtroom, however, jurors are asked to suspend their ordinary ways of thinking. They are to disregard completely the

CALJIC No. 8.73 must be given sua sponte whenever there is evidence to support it, the language is dicta and contrary to later and more explicit Supreme Court pronouncements on the issue. (*People v. Mayfield, supra,* 14 Cal.4th at p. 778; *People v. Saille, supra,* 54 Cal.3d at p. 1120; see also *People v. Lee, supra,* 28 Cal.App.4th at p. 1734 [dicta in *Johnson,* at p. 43 and *Wickersham,* at p. 329 are inconsistent with court's more recent pronouncement on pinpoint instructions in *Saille*].)

self-evident fact the experts and authority figures in this field—the police and district attorney—have evaluated the evidence and concluded the defendant is probably guilty. Instead they are to treat that defendant as completely innocent. Then, when they have heard all the evidence and are asked to decide between a guilty and not guilty verdict they are expected to vote for the not guilty option even if their own appraisal of the evidence leads them to conclude the defendant probably committed the crime—if there remains any "reasonable doubt" about the defendant's guilt.

Anyone who has gone through the voir dire process in a criminal case, whether as the trial judge or trial counsel conducting the voir dire, or as a prospective juror, can testify these concepts often confound most jurors and indeed tend to meet the most resistance from some of those jurors.[1] The only way a judge can hope to produce a jury likely to decide guilt properly is by pounding home the twin themes—the defendant enters the courtroom an innocent person and when weighing the evidence you hear during the trial you must choose the not guilty option even if you believe the defendant is probably guilty unless that probability is so high as to leave you with no reasonable doubt about the defendant's guilt.

In this case we affirm a conviction despite the fact the trial judge failed to give the instruction explaining these critical and difficult concepts at any time after the jury was selected. The court did, however, give that instruction to the prospective jurors before commencing the voir dire examination. This alone would not have been sufficient to overcome the error in failing to deliver the instruction closer to the time the chosen jurors began deliberating.[2] Nor am I as confident as my colleagues this error was rendered harmless by the collateral instructions mentioning proof beyond a reasonable doubt was required, although they helped.

What is more persuasive to me is the repeated emphasis the trial judge placed on the presumption of innocence and proof beyond a reasonable doubt during the voir dire process itself. Both with groups of jurors and in querying individual jurors, the trial judge indeed did "pound home" the concept

---

[1] Sometimes this resistance is voiced by a juror during voir dire, as happened in this trial. Shortly after hearing the trial judge remind another juror about the presumption of innocence, Juror No. 10 said: "I don't believe the person would be arrested and be in court if he wasn't guilty . . . ."

[2] *People v. Vann* (1974) 12 Cal.3d 220, 226 [115 Cal.Rptr. 352, 524 P.2d 824]; *People v. Elguera* (1992) 8 Cal.App.4th 1214, 1220 [10 Cal.Rptr.2d 910]; *People v. Crawford* (1997) 58 Cal.App.4th 815, 820 [68 Cal.Rptr.2d 546].

defendant entered the courtroom an innocent man.[3] The court did the same with the concept the jurors were bound to acquit defendant if they had a reasonable doubt of his guilt after hearing the evidence.[4] During his voir dire, the defense counsel reinforced this lesson, one-on-one with at least 20 individual jurors and the prosecutor did so with at least three.[5]

All in all, it is difficult to imagine any juror subjected to this intensive indoctrination during jury selection could have entered the jury room unaware of the obligation to deviate from his or her usual thinking pattern and instead to accept the initial innocence of defendant and the prosecution's duty to prove defendant not only probably guilty but guilty beyond a reasonable doubt. In the absence of that intensive and focused indoctrination, however, I would have been unwilling to find harmless the trial judge's twin errors, inadvertent as they obviously were, in failing to instruct about the presumption of innocence and to define reasonable doubt before sending those jurors off to decide defendant's fate.

---

[3] For instance, in an open exchange with Juror No. 14 before the entire panel of prospective jurors, the trial judge said: "Well, you understand what I said about Mr. Mayo. Right now he's presumed innocent. Right now you heard nothing and you have to presume him innocent of these charges. Are you going to be able to give him the presumption of innocence?" Later with Juror No. 11, the judge engaged in a longer exchange, again in front of all the prospective jurors. "THE COURT: And you can't speculate as to anything where there is no evidence in front of you, so you are not willing to give Mr. Mayo that presumption of innocence? PROSPECTIVE JUROR 11: I can give him that presumption, yes. THE COURT: And right now he's innocent. PROSPECTIVE JUROR 11: Yes."

[4] For instance, in explaining to the full panel it could not hold it against defendant if he failed to testify, the court began by reminding them again of the prosecution's burden to prove guilt beyond a reasonable doubt. "One of the things I told you, ladies and gentleman, at the beginning of our discussion yesterday was that the people have the burden of proof in this case. And they have to prove this case to you beyond a reasonable doubt. [¶] . . . [¶] As we grow up we always hear the expression there are two sides to every story. Well, in a court of law there is only one side and that is the prosecution. And if they don't prove their case to you beyond a reasonable doubt, even though you may have a curiosity as to what the defendant might have to say, you may wonder why don't we hear from him, you have to set that aside. . . . So if the people haven't proven their case, you have to find the defendant not guilty." "Now, if . . . by the end of the whole case you haven't heard enough evidence to convince you beyond a reasonable doubt that Mr. Mayo is guilty of the crime charged, you have to come back with a verdict of not guilty. It's a little difficult for people to understand if they haven't been involved in the criminal justice system in the past. [¶] Do you understand that the burden remains on the people?"

[5] Although he was more expansive in his questioning of some jurors a typical exchange was Juror No. 5. "DEFENSE COUNSEL: Juror number 5, how about you, do you have any feeling about whether you can be fair or not? PROSPECTIVE JUROR 5: I can be fair. DEFENSE COUNSEL: Can you presume Mr. Mayo to be innocent as he sits here right now? PROSPECTIVE JUROR 5: Yes. DEFENSE COUNSEL: And if after hearing all of the evidence you are suspicious of him, but you have a reasonable doubt as to his guilt, any problem in voting not guilty? PROSPECTIVE JUROR 5: No problem."

I do not mean to suggest a vigorous voir dire is a suitable alternative to delivering a proper instruction when the jury is about to begin deliberating. The failure to give instructions at the appropriate time which define reasonable doubt and explain the presumption of innocence remains error, serious error to my mind. Nonetheless, in my view, the instructions the trial judge did deliver and the heavy emphasis on these concepts during voir dire combine to render that error harmless in this particular case. Accordingly, I concur in the judgment and, because of the high quality and dedication of the trial bench in this county, I am confident nothing in either of our opinions will encourage any trial judge to become careless about instructing on reasonable doubt and the presumption of innocence in future cases.

Appellant's petition for review by the Supreme Court was denied October 11, 2006, S145277. Kennard, J., and Corrigan, J., were of the opinion that the petition should be granted.