Filed 5/3/22  P. v. Diaz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ANTHONY MARTINEZ DIAZ, Defendant and Appellant. | F080321 (Super. Ct. No. 18CMS-3481) OPINION |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Randy L. Edwards, Judge.

Richard M. Oberto, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Meehan, J. and DeSantos, J.

In this appeal defendant, Anthony Martinez Diaz, challenges the constitutional fairness of his trial because a standard instruction on how to view conflicting evidence was not provided. Defendant also challenges the validity of an enhancement charged and found true by the jury for use of a deadly weapon. Defendant believes the enhancement must be stricken because the use of a deadly weapon is an element of the crime he was found guilty of committing, assault with a deadly weapon. While we conclude defendant was not prejudiced by the lack of one jury instruction after reviewing the complete record of how the jury was instructed in this case, we agree the enhancement for the use of a deadly weapon must be stricken.

## FACTUAL AND PROCEDURAL SUMMARY

In June 2018, defendant lived in a house with his mother, a younger sister, B.F., and a younger brother. Also living in the house at that time was F.C., his mother's on-again, off-again boyfriend.

On the morning of June 20, 2018, defendant's mother (mother) and F.C. went to the Laton River with defendant's brother and F.C.'s daughter. While at the river, F.C. was drinking beer. Mother thought F.C. was drunk when he stated defendant's "girlfriend better not be there when we get [home]." In fact, defendant and F.C. argued about this issue twice before. F.C. did not like seeing defendant's girlfriend at the house, because he felt defendant should have his own place as he was now over the age of 18.

Mother testified they returned home at approximately 5:00 p.m. Upon their arrival, she realized defendant was already there with his girlfriend. Mother went through the house, to the backyard, to tell defendant and his girlfriend to leave. His mother explained she was "buzzed" from drinking beer at the river and upset, hoping to avoid an argument between F.C. and defendant. After his mother told defendant to "get out now," defendant and his girlfriend left.

Initially, mother followed defendant to his father's house, approximately half a mile away, to talk to his father about what had happened. When she returned home,

2.

mother realized defendant was already there because his car was in the driveway. Upon entering the house, mother saw F.C. having balance issues. She assumed this was because he was drunk, but when she saw blood as he sat on the couch, she called 911. Mother testified she was not present when F.C. was stabbed.

F.C. testified he never told mother he wanted defendant to move out of the house. In fact, later in his testimony, F.C. stated he had no problem with defendant's girlfriend. Upon returning to the house after their day at the river, F.C. saw mother talking to defendant. Almost immediately afterwards, F.C. and defendant had an argument with defendant asking F.C. what he had told his mother. F.C. denied he said anything to mother.

F.C. and defendant engaged in a fist fight in the backyard, with F.C. being hit in the face. F.C. then grabbed a knife from the kitchen and followed defendant as he was leaving. A fight or struggle involving the knife occurred in the front yard. F.C. testified he could not recall how he was stabbed. F.C. somehow reached the couch in the living room, where he was when the police and EMT arrived. F.C. admitted he had the knife initially, but could not recall how defendant took it away. The knife was never found.

Defendant's sister, B.F., was at the house when the fight occurred. B.F. testified defendant and F.C. would occasionally fight. She also confirmed that her mother told defendant to leave the house that day. B.F. testified that while F.C. had the knife initially, defendant eventually took it away. B.F. explained defendant did not appear to be trying to attack F.C. with the knife, but was holding it with one hand while punching F.C. with the other. B.F. and her mother tried to pull F.C. and defendant apart. While B.F. did not see defendant stab F.C., she did see the blood after the fight.

City of Hanford Police Officer Sean Snodgrass testified he was called to the scene on June 20, 2018. While he was taking pictures, mother told Snodgrass that her son, defendant, was responsible. Officer Anthony Chandler testified he was one of the first emergency personnel on the scene after the 911 call, where he encountered B.F., who told

3.

him her brother (defendant) stabbed F.C. B.F. also told Chandler that defendant was upset about being told to move out of the home. Officer Juan Hernandez interviewed F.C. in Spanish at the scene. F.C. told Hernandez his girlfriend's son stabbed him and that he had the knife when he left.

On March 18, 2019,[1] an information was filed charging defendant with attempted murder (Pen. Code,[2] §§ 664/187, subd. (a); count 1), and assault with a deadly weapon, a felony (§ 245, subd. (a)(1); count 2). Four special allegations were also alleged for both counts: defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)); he personally used a deadly or dangerous weapon in the commission of a serious felony or attempted serious felony (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)); he suffered a prior "strike" conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)); and he suffered a prior conviction for a serious felony (§ 667, subd. (a)(1)).

Following a jury trial, defendant was found not guilty of attempted murder in count 1, but was found guilty of the lesser included offense of attempted voluntary manslaughter (§§ 664/192, subd. (a)). Defendant was also found guilty of count 2, and the jury found true the allegations he personally inflicted great bodily injury, and used a deadly or dangerous weapon.

## DISCUSSION

### I. The Failure to Provide CALCRIM No. 302 to the Jury Did Not Result in Prejudicial Error

The primary argument raised by defendant is that the trial court failed to provide the jury with CALCRIM No. 302, resulting in prejudice.

---

[1] Following the first day of trial, the original information was amended, without objection, to include the word "attempted" in the first count.

[2] All further statutory references are to the Penal Code.

## A. Applicable Law

CALCRIM No. 302 provides:

"If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

The bench notes accompanying this instruction state a trial court has a sua sponte duty to provide this instruction when a jury must weigh contradictory evidence, "unless corroborating evidence is required." (citing *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884.) The People concede this instruction should have been given.

However, the mere fact this instruction was not given should not result in a reversal on its own. When considering a challenge to the instructions given to a jury, a court must look to the instructions "as a whole, not in isolation." (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1182.) The relevant inquiry considers the full context of the instructions given, then asks whether there is a reasonable likelihood the jury was misled, resulting in prejudice to the defendant. (*People v. Landry* (2016) 2 Cal.5th 52, 95.) A court must assume jurors are intelligent and capable of understanding and linking together all jury instructions given. (*Ibid*.) Moreover, the failure to give a standard instruction will not amount to error when its substance is covered in the other instructions given to the jury. (*People v. Aranda* (2012) 55 Cal.4th 342, 354 [addressing the failure to provide the standard "reasonable doubt" instruction].)

When a court has failed to provide an important instruction to a jury, the failure may constitute state law error, which will be reviewed for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837. This test asks whether there is a " 'reasonable probability' that a result more favorable to the defendant would have

occurred absent the error." (*People v. Aranda*, *supra*, 55 Cal.4th at p. 354, citing *People v. Mayo* (2006) 140 Cal.App.4th 535, 550–551.)

## B.     Application

The conflict in the evidence here is not over who was involved in the encounter that led to F.C. being stabbed, or that a knife was involved in that stabbing.  The conflict defendant is citing appears to be over the details of how the fight progressed and exactly how F.C. was injured during the fight.  Identifying the potential conflicts that he believes existed, defendant cites to the differences between what certain witnesses said at the time of the incident about who was responsible, and the testimony offered at trial when those same witnesses were not so certain about who was at fault.

In this case, the jury was instructed with CALCRIM No. 220, the reasonable doubt instruction that specifically tells jurors,

> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all of the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

The jury was also given CALCRIM No. 226 stating,

> "You alone, must judge the credibility or the believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part, or none of any of the witnesses's [*sic*] testimony.  Consider the testimony of each witness and decide how much of it you believe."

CALCRIM No. 226 also instructs jurors they are allowed to consider the "personal relationship" a witness has with someone involved in the case, and whether the witness previously provided inconsistent statements in the case.  The jurors were also provided with CALCRIM No. 318, which provides:

6.

"You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

"1. To evaluate whether the witness's testimony in court is believ[able]; and,

"2. As evidence that the information in those earlier statements is true."

Our review of the entire record and all the jury instructions given to the jurors leads us to conclude the substance of CALCRIM No. 302 was covered in other instructions actually given to the jurors. (See *People v. Mayo*, *supra*, 140 Cal.App.4th at pp. 550–551.) Given the distinctions they were able to draw in finding defendant guilty of attempted voluntary manslaughter instead of attempted murder, we believe the jurors demonstrated an ability to understand and link together all the instructions given on how to view the evidence.

## C.     There Was No Ineffective Assistance of Counsel

Alternatively, defendant contends trial counsel's failure to request CALCRIM No. 302 resulted in his receiving ineffective assistance of counsel. To establish an ineffective assistance of counsel claim, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) On review, we can adjudicate an ineffective assistance claim solely by considering prejudice, without determining the reasonableness of counsel's performance. (*Strickland*, at p. 697; *Ledesma*, at pp. 216–217.)

To establish prejudice, the defendant must make a showing "sufficient to undermine confidence in the outcome" that but for counsel's deficient performance there was a "reasonable probability" that "the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Ledesma*,

*supra*, 43 Cal.3d at pp. 217–218.) We have already explained our conclusion defendant was not prejudiced by the failure of the trial court to give, sua sponte, the instruction contained in CALCRIM No. 302, using the state standard of review found in *Watson*. While we would have preferred that trial counsel made a request for this specific instruction, we do not believe defendant suffered prejudice from this failure, even under the standard set out in *Strickland*. Nor do we believe trial counsel's failure to request the instruction undermined the outcome in this case.

Again, as discussed above, the jury instructions given to the jury addressed the essence of CALCRIM No. 302. Moreover, there was consistency in the overall facts even if there were some differences in the details. Defendant and F.C. engaged in a fist fight. At some point, F.C. introduced a kitchen knife into the fight. There was a struggle between the men that resulted in F.C. suffering wounds from the knife. Several witnesses except F.C. testified defendant was upset before the fight because he believed F.C. was the reason his mother was telling him to move out of the house. Evidence introduced at trial indicated several of the witnesses stated at the time of the incident that defendant was responsible for the injuries F.C. received.

The conflict defendant now believes resulted in prejudice was created when many of these same witnesses claimed at trial that they did not know who was responsible for the injuries F.C. received. We do not believe there is a reasonable probability a different result would have been reached below if CALCRIM No. 302 had been requested and given to the jury. Again, the instructions provided informed the jury about how to consider conflicting testimony. Any resulting prejudice, even under the federal standard expressed in *Strickland*, does not undermine our confidence in the outcome. (See *People v. Stanley* (2006) 39 Cal.4th 913, 954.)

**II.    The Enhancement for the Use of a Deadly or Dangerous Weapon in Count 2 Must Be Stricken**

Defendant was sentenced to a total term of nine years in this case.  For the attempted voluntary manslaughter (count 1), the court selected the middle term of three years, then doubled it because of a prior "strike" conviction.  (§§ 193, subd. (a), 664, subd. (a).)  To this the court added three years for the finding defendant inflicted great bodily injury.  (§ 12022.7, subd. (a).)  The remaining enhancements and the sentence for count 2 were stayed.

The issue here, however, is that in count 2 defendant was convicted of assault with a deadly weapon, with the jury further finding he committed this offense while personally using a deadly or dangerous weapon.  (§§ 245 subd. (a)(1), 12022, subd. (b)(1).)  "A conviction under section 245, subdivision (a)(1) cannot be enhanced pursuant to section 12022, subdivision (b)."  (*People v. Summersville* (1995) 34 Cal.App.4th 1062, 1070, citing *People v. McGee* (1993) 15 Cal.App.4th 107, 110.)  This point is conceded by the People.  The enhancement must, therefore, be stricken, even though this portion of the sentence was ultimately stayed.  Therefore, an amended abstract of judgment must be prepared showing this change has been made.

## DISPOSITION

The trial court is directed to strike the section 12022, subdivision (b)(1) enhancement to count 2.  The trial court is also directed to prepare an amended abstract of judgment reflecting that change, and to forward the amended abstract of judgment to the appropriate authorities.  In all other respects, the judgment is affirmed.